UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

DEONTE COOPER a/k/a Terry,

Defendant.

**DECISION AND ORDER**

1:18-CR-00126 EAW

Defendant Deonte Cooper a/k/a Terry ("Defendant") was convicted after a jury trial of Count 1 of a Second Superseding Indictment charging conspiracy to commit firearms offenses in violation of 18 U.S.C. § 371.  (Dkt. 334; *see* Dkt. 246).  Sentencing is scheduled for August 19, 2020.  (Dkt. 434).  Pending before the Court are Defendant's motions pursuant to Federal Rule of Criminal Procedure 29 for an acquittal, or alternatively seeking a new trial pursuant to Federal Rule of Criminal Procedure 33.  (Dkt. 340; *see also* Dkt. 310).  For the reasons discussed below, Defendant's motions pursuant to Rules 29 and 33 are denied.

I.    **RULE 29 MOTION**

A.    Legal Standard

Rule 29(c)(1) of the Federal Rules of Criminal Procedure provides that "[a] defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict. . . ."  The standard on a motion for a judgment of acquittal is stringent, and a defendant claiming that he was convicted based on insufficient evidence "bears a very heavy burden."  *United States v. Blackwood*, 366 F. App'x 207, 209 (2d Cir. 2010)

- 1 -

(quoting *United States v. Desena*, 287 F.3d 170, 177 (2d Cir. 2002)).  "In considering a motion for judgment of acquittal, the court must view the evidence presented in the light most favorable to the government."  *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999).  Accordingly, "[a]ll permissible inferences must be drawn in the government's favor."  *Id.*

"If *any* rational trier of fact could have found the essential elements of the crime, the conviction must stand."  *United States v. Puzzo*, 928 F.2d 1356, 1361 (2d Cir. 1991) (quotation omitted).  "The test is whether the jury, drawing reasonable inferences from the evidence, may fairly and logically have concluded that the defendant was guilty beyond a reasonable doubt."  *Id.* (quotation omitted).  The evidence must be viewed "in its totality, not in isolation," *United States v. Huezo*, 546 F.3d 174, 178 (2d Cir. 2008) (quotation omitted), "as each fact may gain color from others," *Guadagna*, 183 F.3d at 130.  The Court may enter a judgment of acquittal only if the evidence that the defendant committed the crime is "nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."  *Id.* (quotation omitted).

A district court must be careful not to usurp the role of the jury.  "Rule 29(c) does not provide the trial court with an opportunity to 'substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury.'"  *Id.* at 129 (alteration in original) (quoting *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984)).  "A jury's verdict will be sustained if there is substantial evidence, taking the view most favorable to the government, to support it."  *United States v. Nersesian*, 824 F.2d 1294, 1324 (2d Cir. 1987).  The government is not required "to preclude every

reasonable hypothesis which is consistent with innocence." *United States v. Chang An-Lo*, 851 F.2d 547, 554 (2d Cir. 1988) (citing *United States v. Fiore*, 821 F.2d 127, 128 (2d Cir. 1987)).

    B.   <u>Defendant's Rule 29 Motion</u>

At the close of the Government's proof, Defendant moved pursuant to Rule 29 for a judgment of acquittal. (Dkt. 310). The Court reserved decision. Defendant timely renewed that motion after the jury returned its verdict. (Dkt. 340; Dkt. 340-1). Defendant argues that the evidence was insufficient to convict him of the firearms conspiracy because there was "[n]o evidence of inculpatory conversations between the defendant and his alleged co-conspirators," "there was no evidence presented that showed [Defendant] ever possessed a gun bought by one of the co-conspirators," "the government's entire case rests on the fact that he was merely present in some instances (not every) when the straw purchasers were approached by [co-conspirator Robert L. Williams, Jr.]," "every witness that the government called to testify at trial confirmed that Deonte Cooper was not a participant in the firearms conspiracy and that he was not in the firearms business," Defendant never "participated in the purchase of firearms" nor did he "provide[] transportation to any of the straw purchasers or ever set foot near a gun store," and he did not finance the purchase of any firearms. (Dkt. 340-1 at 4, 9). Defendant purports to summarize the trial testimony of various witnesses (*id.* at 5-9) and concludes that acquittal is mandated in his favor (*id.* at 10-11).

"A conspiracy conviction under § 371 requires proof of three essential elements: (1) an agreement among two or more persons, the object of which is an offense against the

United States; (2) the defendant's knowing and willful joinder in that conspiracy; and (3) commission of an overt act in furtherance of the conspiracy by at least one of the alleged co-conspirators." *United States v. Svoboda*, 347 F.3d 471, 476 (2d Cir. 2003). "Conspiracies are secretive by their very nature, and it is thus well-settled that the elements of a conspiracy may be proved by circumstantial evidence." *Id.* at 477; *see United States v. Glenn*, 312 F.3d 58, 64 (2d Cir. 2002) ("[T]he prosecution may prove its case entirely by circumstantial evidence so long as guilt is established beyond a reasonable doubt."). Indeed, in cases involving conspiracy convictions, "deference to the jury's findings is especially important . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Snow*, 462 F.3d 55, 68 (2d Cir. 2006) (alteration in original) (quotation omitted).

Here, Defendant appears to challenge the second element of a § 371 conspiracy— that he knowingly and willfully joined in the conspiracy. However, Defendant's recitation of the evidence introduced at trial is selective and inaccurate, and the Government rightly contends that Defendant inappropriately construes the record evidence "in a light most favorable to *him*." (Dkt. 346 at 13). Contrary to Defendant's claims, evidence was introduced at trial of inculpatory conversations between Defendant and his alleged co-conspirators, there was evidence that Defendant possessed firearms provided by his alleged co-conspirators, the evidence established more than just Defendant's mere presence with criminal actors, and Defendant helped finance the purchase of firearms by providing heroin to the straw purchasers in exchange for their services.

- 4 -

The evidence introduced at trial established that Robert L. Williams, Jr. ("Williams") used straw purchasers to acquire firearms in Ohio, and he arranged to transport the firearms to Buffalo, New York, where he sold them for a profit. Defendant recruited straw purchasers for Williams, primarily from his customer base of heroin addicts. Defendant paid his customers in heroin for their straw purchasing and other activities in furtherance of the conspiracy. Defendant's apartment at 6259 Runkle Avenue in Ashtabula, Ohio, was a base of operations for this conspiracy. (*See, e.g.*, Dkt. 396 at 7, 9-10, 13, 21 (Leonard Hoffstetter testifying that Defendant was his heroin supplier, that he and his wife were addicts, that Defendant introduced him to "his cousin" who recruited him and his wife to become straw purchasers, and that he was paid with drugs from Defendant); Dkt. 403 at 10, 21 (Vicky Hoffstetter[1] testifying that she was using a gram of heroin a day supplied by Defendant and that she agreed to purchase firearms in exchange for heroin)).

---

[1]      Defendant argues that the Government's contention that Vicky Hoffstetter met with Defendant and Williams regarding the conspiracy is "outrageous" and "proven to be patently false" because she was unable to identify Defendant at trial. (Dkt. 340-1 at 5). The Court disagrees. The trial testimony revealed that Ms. Hoffstetter's husband, Leonard, was the one who made the arrangements with Defendant and Williams to engage in the straw purchasing, but he was not able to personally purchase the firearms because of "domestic violence convictions," so he arranged for his wife to buy the firearms. (Dkt. 396 at 6-10). Vicky Hoffstetter testified that her husband was the one who would purchase heroin from Defendant, that she had only been inside the Runkle Avenue apartment on one occasion, and that she did not encounter Defendant enough to be able to identify him. (Dkt. 403 at 10-13). Therefore, the fact that she was unable to identify Defendant at trial did not undermine the credibility of her testimony concerning her involvement in the conspiracy. In any event, the jury had an opportunity to consider all of this evidence, including the lack of identification by Vicky Hoffstetter, but nonetheless agreed with the Government's contention that Defendant was part of the firearms conspiracy.

Williams pleaded guilty and testified at trial on behalf of the Government. He described Defendant as his "cousin"[2] (Dkt. 347 at 5), and that sometime in early 2018 (February or March), he was at Defendant's Runkle Avenue apartment, when a heroin user arrived offering to sell Defendant a gun for heroin (*id.* at 25-28). Williams asked Defendant for permission to purchase the gun from this individual, and Defendant voiced no objection, so Williams purchased the gun and brought it back to Buffalo where he sold it. (*Id.* at 30-32). After that transaction, Williams returned to Ohio "a couple days later" and asked Defendant "could he get somebody to help get some more guns." (*Id.* at 32). Thereafter, Victoria Orlando ("Orlando") arrived at Defendant's Runkle Avenue apartment, and Defendant gave Williams "permission" to speak to Orlando about purchasing guns for him. (*Id.* at 34-35). Orlando was willing to do this, but first wanted heroin that was provided by Defendant. (*Id.* at 35-36). Williams testified about additional individuals who were drug addicts and who were recruited to purchase guns for him as straw purchasers, and he would pay these individuals with cash or drugs. (*Id.* at 38-43, 156-57, 165). The drugs were provided by Defendant (*id.* at 43) and the cash was used to purchase drugs from Defendant (*id.* at 165). Williams testified that Defendant financially benefited from the arrangement because Williams paid these straw purchasers to transport or buy firearms, and then they used that cash to pay Defendant for drugs. (*Id.* at 164-65). Williams explained why he solicited Defendant to recruit straw purchasers on his behalf:

---

[2]     Williams explained that they "have family members that have kids by each other" (Dkt. 347 at 6) and that he started dating Defendant's cousin in September 2017 (*id.* at 17). Other witnesses also testified that Defendant referred to Williams as his cousin. (Dkt. 396 at 9 (Leonard Hoffstetter); Dkt. 404 at 12 (Diones Bowens)).

Q:      Now, when you were buying guns in Ohio, did you talk to [Defendant] about it?

A:      Yes, I talked to him numerous times.

Q:      What did you talk to him about?

A:      I just told, like, I would ask him to get the people, you know, I needed more people.

Q:      Why did you need more people?

A:      Because I couldn't—I didn't want to use the same people so many times and get in trouble.

Q:      Why did you think you were going to get in trouble?

A:      Because I was buying so many guns.

(*Id.* at 68-69).

Orlando was one of Defendant's heroin customers who was intimately involved in the conspiracy.  She pleaded guilty and testified on behalf of the Government.  Orlando testified that she was using two grams of heroin a day in 2017, and she obtained her drugs exclusively from Defendant.  (Dkt. 317 at 21-22).  She was introduced to Williams by Defendant in March 2018, when she was purchasing heroin from Defendant at his Runkle Avenue apartment.  (*Id.* at 32-34).  Defendant asked her whether she had a valid I.D., and after Orlando responded in the affirmative, Defendant asked her to give Williams a ride to Medina, Ohio (about two to three hours away).  (*Id.* at 35-36).  This conversation occurred in the kitchen, and Williams was not present.  (*Id.* at 36).  In other words, the evidence supported the conclusion that Defendant actively recruited Orlando to engage in the firearms conspiracy—he was not just an innocent bystander.  Orlando agreed to

- 7 -

Defendant's request, asking for gas money and drugs, and Defendant gave her a gram of heroin.  (*Id*. at 38-39).  After going with Williams to purchase firearms, they returned to Defendant's apartment on Runkle Avenue, and Defendant asked Orlando to drive Williams back to Buffalo (an approximate three-hour trip).  (*Id*. at 59-61, 67; *see id*. at 61 ("Q:  And why were you driving back to Buffalo?  A:  I was driving the guns back to Buffalo.")).  Orlando told Defendant that she would do this, in exchange for "[m]ore drugs and gas money."  (*Id*. at 61).  Orlando testified that this arrangement continued, where she would purchase firearms for Williams and would drive him to Buffalo, and she was paid with drugs from Defendant.  (*Id*. at 78-79, 88-89, 107-08, 115-16).

Defendant also recruited Diones Bowens ("Bowens"), who pleaded guilty and testified at trial on behalf of the Government.  He testified that he met Williams at Defendant's Runkle Avenue apartment and that he was recruited to purchase firearms for Williams by Defendant for the purpose of making money.  (Dkt. 404 at 11-12; *see also* Dkt. 317 at 132-33 (Orlando testifying that Bowens was recruited by Defendant)).  Like Orlando, Defendant recruited Bowens in a private conversation outside Williams' presence—again, Defendant was not simply an innocent bystander.  (Dkt. 404 at 13, 98).

Evidence was also introduced at trial that Defendant physically possessed firearms acquired as part of the conspiracy.  (*See* Dkt. 317 at 104-05, 116-19 (Orlando describing bringing two firearms from Buffalo and some of the new firearms purchased on April 15, 2018, into the Runkle Avenue apartment so that Defendant could inspect them and decide what to purchase, and that not all the firearms were returned to her vehicle); *see also* Dkt. 347 at 70 (Williams testifying that he sold a rifle to Defendant "[w]hen [he] . . . first came

- 8 -

down")).  Evidence was also introduced concerning the results of a search warrant executed at the Runkle Avenue apartment on May 30, 2018, where drugs, drug paraphernalia, and a rifle that was reported stolen from Tonawanda, New York, were recovered.  (*See* Dkt. 346 at 11).

Defendant makes much of the testimony by certain witnesses that they did not have an express agreement with Defendant to engage in a firearms conspiracy.  However, a witnesses' interpretation of his or her understanding with Defendant is not dispositive as to the legal question of whether Defendant was part of the conspiracy.  It is well-settled that "[a] conspiracy need not be shown by proof of an explicit agreement but can be established by showing that the parties have a tacit understanding to carry out the prohibited conduct."  *United States v. Samaria*, 239 F.3d 228, 234 (2d Cir. 2001) (quoting *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999)), *abrogated on other grounds by United States v. Huezo*, 546 F.3d 174, 180 n.2 (2d Cir. 2008); *see United States v. Flores*, 945 F.3d 687, 712 (2d Cir. 2019) (discussing "[t]he crux of a conspiracy is an agreement between two or more persons to join together to accomplish something illegal" and that agreement "may be tacit rather than explicit" (quotations omitted)); *United States v. Babilonia*, 854 F.3d 163, 175 (2d Cir. 2017) ("[P]roof of a tacit understanding will suffice." (alteration in original) (quotation omitted)), *cert. denied*, *Key v. United States*, 138 S. Ct. 438 (2017); *United States v. Rutigliano*, 790 F.3d 389, 402 (2d Cir. 2015) ("And it is true that the conspiratorial agreement . . . may be established by proof of a tacit understanding among the participants, rather than by proof of an explicit agreement." (alteration in original) (quotation omitted)).  In other words, the fact that certain witnesses denied the existence of

an express agreement with Defendant to conspire to commit firearms offenses is not determinative.  The jury had an opportunity to consider this evidence, and after being appropriately instructed on the law, plainly rejected Defendant's theory that this testimony somehow exonerated him from any involvement.

The evidence at trial was overwhelming as to the existence of the firearms conspiracy as alleged in the Second Superseding Indictment, which had three objectives: (1) illegally transporting or receiving into New York firearms purchased in Ohio, in violation of 18 U.S.C. §§ 922(a)(3) and 924(a)(1)(D); (2) making false statements to acquire firearms in violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(2); and (3) unlawfully dealing firearms in violation of 18 U.S.C. §§ 922(a)(1)(A), 923(a), and 924(a)(1)(D).  (Dkt. 246 at 2).  Defendant does not even attempt to argue that a conspiracy was not proven at trial or that overt acts were not taken in furtherance of the conspiracy; rather, his Rule 29 motion is focused on his involvement in the conspiracy.  Of course, "mere presence at the scene of a crime, even when coupled with knowledge that a crime is being committed, is insufficient to establish membership in a conspiracy."  *Aleskerova*, 300 F.3d at 292 (quotation omitted); *see United States v. Anderson*, 747 F.3d 51, 61 (2d Cir. 2014) ("We have often observed, however, that a defendant's mere presence at the scene of a crime, his general knowledge of criminal activity, or his simple association with others engaged in a crime are not, in themselves, sufficient to prove the defendant's criminal liability for conspiracy."); *United States v. Lorenzo*, 534 F.3d 153, 159-60 (2d Cir. 2008) ("But '[s]uspicious circumstances . . . are not enough to sustain a conviction for conspiracy,' and 'mere association with those implicated in an unlawful undertaking is not enough to prove

knowing involvement,'; likewise, 'a defendant's mere presence at the scene of a criminal act or association with conspirators does not constitute intentional participation in the conspiracy, even if the defendant has knowledge of the conspiracy.'" (alterations in original) (citations omitted) (quoting *United States v. Nusraty*, 867 F.2d 759, 762-64 (2d Cir. 1989), and *Samaria*, 239 F.3d at 235)).   But the evidence summarized above established far more than Defendant's mere presence or suspicious circumstances—he was an active recruiter of straw purchasers, he paid co-conspirators in heroin for their services on behalf of the conspiracy, and his Runkle Avenue apartment was a base of operations for the conspiracy.  In other words, the jury fairly and logically concluded that Defendant was guilty beyond a reasonable doubt of the firearms conspiracy—including through his knowing and willful joining of the conspiracy.

To the extent Defendant argues that he "never participated in the purchase of firearms," nor did he "provide[] transportation to any of the straw purchasers or ever set foot near a gun store" (Dkt. 340-1 at 9), it is true that Defendant's role in the conspiracy did not involve him personally engaging in straw purchases or transporting firearms to Buffalo.  However, he played other roles in the conspiracy—again, recruiting straw purchasers, paying straw purchasers with heroin, and providing his apartment as a base of operations.  "The size of a defendant's role does not determine whether that person may be convicted of conspiracy charges.  Rather, what is important is whether the defendant willfully participated in the activities of the conspiracy with knowledge of its illegal ends." *United States v. Vanwort*, 887 F.2d 375, 386 (2d Cir. 1989).

Finally, Defendant's challenges to the credibility of the witnesses in support of his Rule 29 motion are misplaced.  The jury was allowed to consider the various challenges to the witnesses, most significantly Williams and Orlando, based on among other things, their drug use during the relevant time period, their criminal activity, their cooperation agreements with the Government, and inconsistencies during certain portions of the testimony.  Deference must be appropriately accorded the jury's resolution of those issues in favor of a guilty verdict.  *See United States v. Pugh*, 945 F.3d 9, 19 (2d Cir. 2019) ("The reviewing court must 'defer[ ] to the jury's assessment of witness credibility and its assessment of the weight of the evidence.'" (alteration in original) (quoting *United States v. Baker*, 899 F.3d 123, 129 (2d Cir. 2018))); *United States v. Riggi*, 541 F.3d 94, 108 (2d Cir. 2008) ("All issues of credibility, including the credibility of a cooperating witness, must be resolved in favor of the jury's verdict."); *United States v. Glenn*, 312 F.3d 58, 64 (2d Cir. 2002) ("Consequently, even though each of the Government witnesses (except Johnson) had pled guilty to large-scale drug dealing and testified pursuant to cooperation agreements with the Government and even though their testimony was pock-marked with inconsistencies, at this stage we credit what they said.").  Furthermore, it was not just one witness who provided testimony supporting Defendant's involvement in this conspiracy, but rather several witnesses provided evidence to support this contention, and the evidence was corroborated by physical evidence seized from Defendant's Runkle Avenue apartment.

Therefore, for all of the foregoing reasons, Defendant's Rule 29 motion is denied.

## II.   <u>RULE 33 MOTION</u>

### A.   <u>Legal Standard</u>

Rule 33 of the Federal Rules of Criminal Procedure allows a court to vacate a judgment and grant a new trial "if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice*."  United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001).  "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33. . . ."  *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009).

"Because motions for a new trial are disfavored in this Circuit the standard for granting such a motion is strict; that is, newly discovered evidence must be of a sort that could, if believed, change the verdict."  *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995).  Indeed, to justify the granting of a Rule 33 motion, "a district court must find that there is a real concern that an innocent person may have been convicted."  *McCourty*, 562 F.3d at 475 (quotation and citation omitted).  For these reasons, a court will grant a new trial only "in the most extraordinary circumstances."  *United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993).

### B.   <u>Defendant's Rule 33 Motion</u>

The basis for Defendant's Rule 33 motion is his allegation "that jurors were clearly distracted by the pending national crisis related to the COVID-19 outbreak."  (Dkt. 340 at ¶ 6).  Defendant contends that at a minimum he must be permitted to interview jurors and collect affidavits as it is "the only way to ensure that deliberations were not unduly influence[d] by exogenous factors."  (*Id*. at ¶ 10).  Defendant hypothesizes that "one or

more of the jurors who maintained that Deonte Cooper was innocent decided to go along with the rest of the jurors, not because they viewed the evidence as pointing to a conviction, but because they were worried, scared, and desired to be home with their families during this uncertain and troubling time." (*Id.* at ¶ 19).

The trial in this matter commenced with jury selection on February 24, 2020. (Dkt. 283). Proof was completed on March 9, 2020 (Dkt. 312), closing arguments were presented on March 10, 2020 (Dkt. 313), and the jury was charged and commenced its deliberations on March 11, 2020 (Dkt. 318). The jury continued to deliberate on March 12, 2020, and the following day, on March 13, 2020, it reached a unanimous verdict. (Dkt. 319; Dkt. 320).

Almost immediately after the jury began its deliberations on March 11, 2020, the undersigned was notified by the Chief Judge that he was proposing to implement screening at both courthouses in the District so that anyone entering either building would be questioned by Court Security Officers as to certain COVID-19 related criteria.[3] The undersigned immediately brought this development to the attention of counsel, and everyone agreed that instead of bringing the jurors back into the courtroom, the Courtroom Deputy would alert the jurors to this newly implemented screening to ensure that no juror

---

[3]     This screening was reflected by the Order signed by Hon. Frank P. Geraci, Jr., Chief Judge, United States District Court, on March 12, 2020, entitled "In re Visitor Restrictions in Response to COVID-19 Virus." Screening continues to this day, although the criteria has been modified to account for developments concerning the current pandemic. *See* General Order of Hon. Frank P. Geraci, Jr., Chief Judge, United States District Court (W.D.N.Y. July 15, 2020).

would face difficulty when entering the courthouse.  The Courtroom Deputy told the jurors about the screening criteria and confirmed that no juror voiced any concerns or issues.

During the deliberations that continued through March 13, 2020, no party brought any concerns to the Court's attention concerning the COVID-19 pandemic and its potential impact on the jury.  Moreover, no juror brought any concerns to the Court.  Put simply, it was not mentioned at all by the jurors.  Indeed, the undersigned met with the jurors immediately following the verdict to personally thank them for their service, and none of the jurors expressed any concerns about COVID-19.

Federal Rule of Evidence 606(b)(1) bars jurors from testifying "about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment."[4]  However, the rule is not absolute and will yield "to the need for juror testimony in situations where there is a reduced potential for harassment or embarrassment

---

[4]     The Court questions whether an inquiry as to the purported impact of the COVID-19 pandemic on the timing of a juror's decision-making in this case and whether any particular juror felt pressure to reach a verdict, would be proper under Rule 606(b)(1). Indeed, it seems quite apparent that any such inquiry would be directed at "the effect of anything on that juror's or another juror's vote" and the "juror's mental processes concerning the verdict or indictment"—areas expressly proscribed from inquiry by Rule 606(b)(1)—and it would be directed at subjective thought processes as opposed to objective facts.  At least one court has concluded that "inquiring into jurors' views regarding the coronavirus outbreak when no concern had been raised by any member of the jury would have constituted an improper intrusion into their deliberations in violation of Rule 606(b)(1)." *United States v. Dermen*, __ F. Supp. 3d __, Case No. 2:18-cr-00465-JNP-BCW, 2020 WL 1676770, at *7 (D. Utah Apr. 6, 2020) (citing *Tanner v. United States*, 483 U.S. 107, 122 (1987)).  Because there is no basis to conclude the jurors were unduly influenced in their deliberations by the COVID-19 pandemic, and thus no post-verdict inquiry is warranted, the Court does not resolve the issue of whether such an inquiry would run afoul of Rule 606(b)(1).

of jurors, such as when evidence concerning objective facts is sought." *United States v. Moten*, 582 F.2d 654, 664-65 (2d Cir. 1978) (explaining that Rule 606(b) allows for testimony "concerning 'whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror'" (quoting *Mattox v. United States*, 146 U.S. 140, 148-49 (1892))). However, there must be "reasonable grounds" to conduct any post-verdict inquiry of jurors, which means "clear, strong, substantial and incontrovertible evidence, that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant." *United States v. Moon*, 718 F.2d 1210, 1234 (2d Cir. 1983) (citation omitted).

Many of the same balancing considerations underpinning Rule 606(b) also apply to post-verdict interviews of jurors. But the Second Circuit has cautioned about an additional consideration for post-verdict interviews of jurors:

> Human nature is such that some jurors, instead of feeling harassed by post-trial interviewing, might rather enjoy it, particularly when it involves the disclosure of secrets or provides an opportunity to express misgivings and lingering doubts. A serious danger exists that, in the absence of supervision by the court, some jurors, especially those who were unenthusiastic about the verdict or have grievances against fellow jurors, would be led into imagining sinister happenings which simply did not occur or into saying things which, although inadmissible, would be included in motion papers and would serve only to decrease public confidence in verdicts. Thus, supervision is desirable not only to protect jurors from harassment but also to insure that the inquiry does not range beyond subjects on which a juror would be permitted to testify under Rule 606(b).

*Moten*, 582 F.2d at 665. Thus, the law is well-settled in the Second Circuit that "where a full dress inquiry" of jurors post-trial is sought by a party, it "must only be conducted under the strict supervision and control of the court, with inquiry restricted to those matters found

by the court as both relevant and proper." *United States v. Brasco*, 516 F.2d 816, 819 n.4 (2d Cir. 1975); *see United States v. Gagnon*, 282 F. App'x 39, 40 n.1 (2d Cir. 2008) (observing that defense counsel's "post-verdict contact with the former juror was wholly inappropriate" where counsel "commenced his investigation without giving notice to either the court or to opposing counsel"); *United States v. Ianniello*, 866 F.2d 540, 544 (2d Cir. 1989) ("It is well-settled that the district court may bring post-verdict juror interrogation under its control. . . ."). The Second Circuit has warned that "post-verdict inquiries may lead to evil consequences: subjecting juries to harassment, inhibiting juryroom deliberation, burdening courts with meritless applications, increasing temptation for jury tampering and creating uncertainty in jury verdicts." *Id*. at 543. Accordingly, "a convicted defendant should not be allowed to waste the time of a district judge or inconvenience jurors merely to conduct a fishing expedition." *Moten*, 582 F.2d at 667 (collecting cases denying requests for post-verdict interviews of jurors); *see Baker*, 899 F.3d at 131-34 (district judge did not err in denying requests to conduct post-verdict interviews of jurors, even though juror contacted defense counsel post-verdict to express various concerns).

Moreover, if a defendant is aware of the alleged prejudicial outside influence before the jury finishes deliberating, but fails "to ask for a more intensive voir dire of jurors during the trial," this will operate as a waiver of the right to seek a post-verdict investigation. *Moten*, 582 F.2d at 667; *see United States v. Gersh*, 328 F.2d 460, 463 (2d Cir. 1963) (waiver of request to inquire of jury will occur "if defense counsel had known of the incident before the case was submitted to the jury or while it was deliberating, but had nevertheless stood mute, gambling on an acquittal while holding this issue in reserve").

Despite never raising any concerns during the trial or prior to the jury verdict, Defendant now argues that the progression of the COVID-19 pandemic "debuted in New York State with a vengeance at the end of the trial," and that the "progression was continually publicized and it is certain that all of the jurors saw and experienced the panic in [the] news about the virus."  (Dkt. 340 at ¶ 18).  Defendant blatantly mischaracterizes the atmosphere in Western New York at the time of the jury's deliberations and verdict. During those three days, from March 11 to March 13, 2020, the general public in Western New York did not appear to fully appreciate the seriousness of the COVID-19 pandemic or the measures that would need to be taken to contain the virus.

As of March 13, 2020, there were no confirmed cases of COVID-19 in the Buffalo area.  *See* News Editorial Board, *Public Officials Responding Smartly to Danger of COVID-19*, Buffalo News (Mar. 13, 2013), https://buffalonews.com/news/local/public-officials-responding-smartly-to-danger-of-covid-19/article_081c3a97-3f56-51ce-937f-05cea8c4bdf9.html ("Western New York confronts the likely but unconfirmed presence of COVID-19 in its midst[.]").  Public events such as concerts and carnivals were held that week and into the weekend.  *See* Aaron Besecher, *Holiday Valley's Winter Carnival Still on this Weekend*, Buffalo News (Mar. 13, 2020), https://buffalonews.com/news/local/holiday-valleys-winter-carnival-still-on-this-weekend/article_d01142a7-88b2-537d-af5d-d47a6699626e.html ("Holiday Valley Ski Resort in Ellicottville is still holding its Winter Carnival this weekend, though it has modified some plans and canceled some events due to concerns over the spread of the novel coronavirus."); *3 Can't-Miss Shows: Night Slaves, Crikwater, Vundabar*, Buffalo News

(Mar. 12, 2020), https://buffalonews.com/entertainment/3-cant-miss-shows-night-slaves-crikwater-vundabar/video_db7351a3-ea7c-5b49-9853-661275f58a6b.html;           Dale Anderson, *Precautions Stepped Up Locally in Face of COVID-19 Threat*, Buffalo News (Mar. 11, 2020), https://buffalonews.com/sports/precautions-stepped-up-locally-in-face-of-covid-19-threat/article_b270b494-8370-53fd-b65b-ad4ea61985f8.html ("The Buffalo Philharmonic said Wednesday that all concerts at Kleinhans Music Hall will continue to be held as scheduled, and added that it is upgrading its housekeeping and sanitary procedures in response to COVID-19.").  A *Buffalo News* article from Sunday March 15, 2020, noted that "[t]he largest downtown employers have not yet enacted widespread remote-work policies, and as of Friday [March 13, 2020], lunch spots like the Expo Market reported only modest dips in business."  Caitlin Dewey, *The Week that COVID-19 Changed Our Lives: "It Feels So Abrupt"*, Buffalo News (Mar. 15, 2020), https://buffalonews.com/news/local/the-week-that-covid-19-changed-our-lives-it-feels- so -abrupt/article_3bda1ed0-f119-5e2a-98d9-a9aba5740ad0.html.  The article also discussed that "customer service employees for multiple airlines at the Buffalo Niagara International Airport said they hadn't noticed much impact yet."  *Id.*

It is true that public and private officials in Western New York had begun to take some actions at that time.  Chief Judge Geraci issued the Order of March 12, 2020, that persons entering federal courthouses in the Western District of New York would be asked questions pertinent to potential exposure to COVID-19.  *See In re Visitor Restrictions in Response to the COVID-19 Virus* (W.D.N.Y. Mar. 12, 2020).  The State University of New York ("SUNY") system announced on March 11, 2020, that it would be moving to online

classes starting on March 19, 2020.  *See* Lauren Camera, *SUNY, CUNY Move to Online Courses Amid Coronavirus*, U.S. News & World Rep. (Mar. 11, 2020, 4:32 PM), https://www.usnews.com/news/education-news/articles/2020-03-11/suny-cuny-move-to-online-courses-amid-coronavirus.   Additionally, two conventions were cancelled, *see* Mark Mulville, *College Fair Tops New Event Cancellations as Coronavirus Scare Affects Bookings*, Buffalo News (Mar. 11, 2020), https://buffalonews.com/business/local/college-fair-tops-new-event-cancellations-as-coronavirus-scare-affects-bookings/article_f74f18ca-be7e-553d-ae77-3960a4ad2e8c.html, as were the St. Patrick's Day parades in Buffalo, *see* Aaron Besecker, et al., *It's Official St. Patrick's Day Parades in Buffalo Canceled*, Buffalo News (Mar. 12, 2020), https://buffalonews.com/news/local/its-official-st-patricks-day-parades-in-buffalo-canceled/article_251f5a5a-d734-5b08-af18-ec560e5737c2.html.

However, at the time, these measures were arguably perceived as precautionary and extreme.  A news article covering the cancellation of the conventions characterized the events as "the first major ones in the region to fall victim to concerns over the virus."  *See Mulville*, *supra*.  Another news article reported that SUNY students were not worried about the presence of the virus in Buffalo, but were instead concerned about students travelling from the New York City area potentially bringing the virus back with them.  Harold McNeil, *SUNY's Coronavirus Shift to Online Classes Raises Anxiety Among Buffalo State Students*, Buffalo News (Mar. 12, 2020), https://buffalonews.com/news/local/sunys-coronavirus-shift-to-online-classes-raises-anxiety-among-buffalo-state-students/article_31a30896-e175-55e9-9d32-98fc96b8c0b1.html ("'I feel like what they should do for students that live on campus is anyone that wants to go back [downstate] has every right to

go back, but they shouldn't be allowed back on campus because they have the potential of bringing back the virus,' said Edwin Diaz, an 18-year-old freshman from Long Island."). Buffalo-area residents continued to have St. Patrick's Day celebrations over the weekend despite the cancellation of the parades.  *See* Barbara O'Brien, *St. Patrick's Day Goes on in the Old First Ward: "Coronavirus . . . Won't Stop Us from Coming Down"*, Buffalo News (Mar. 14, 2020), https://buffalonews.com/news/local/st-patricks-day-goes-on-in-the-old-first-ward-coronavirus-wont-stop-usfrom/article_f6bc056a-12e9-5119-89b0-aa13b5f2aa 86.html ("Several folks celebrating along Hamburg Street said they were not concerned about the new coronavirus because there had not been a confirmed case in Erie County."). Moreover, it was not until after the return of the verdict in this case that the Erie County Executive declared a state of emergency, and it was announced that public schools would be shut down.  *See* Jonathan D. Epstein, *Erie, Niagara Schools Begin Closing Monday, Many for More than a Month*, Buffalo News (Mar. 15, 2020), https://buffalonews.com/news/local/erie-niagara-schools-begin-closing-monday-many-for-more-than-a-month/article_7b089eca-ea04-5062-8bbf-27266d80954e.html.

While New York state officials did eventually adopt extreme measures to address the COVID-19 pandemic, Governor Cuomo did not do so until March 20, 2020, when he signed the "New York State on PAUSE" Executive Order, which, among other things, mandated a 100% closure of non-essential businesses statewide and temporarily banned all non-essential gatherings of individuals of any size for any reason other than the provision of essential services.  *New York State on PAUSE*, New York State, https://coronavirus.health.ny.gov/new-york-state-pause (last visited August 3, 2020).

Today, after living through months of a full-scale pandemic that shutdown the entirety of New York State, it is difficult to imagine a time when COVID-19 was not at the forefront of everyone's minds.  But just two weeks before the jury started their deliberations, the biggest news in Buffalo was the filming of the motion picture "Nightmare Alley" and sightings of movie star Bradley Cooper.  Shooting the film required 200 extras, antique vehicles brought in from New York City, and hundreds of crew members from around the country—a feat which seems all but impossible, even alien, some five months later.  *See* Deidre Williams, *The Snow Went On and So Did the Show as Niagara Square Went Hollywood*, Buffalo News (Feb. 27, 2020), https://buffalonews.com/ entertainment/the-snow-went-on-and-so-did-the-show-as-niagara-square-went-hollywood /article_7784d6da-a7f6-5bb1-a3ea-0eb5ad7ee100.html.

Thus, in hindsight, it may now seem as though the COVID-19 pandemic was in full swing toward the end of this trial, but the reality is that the facts were fast developing, and it was not until the following week (the week of March 16, 2020), that the situation drastically changed in Western New York.  Indeed, Defendant's failure to raise this issue while the jury was deliberating reflects the general lack of concern that the greater Buffalo area had for the virus at the time.  Even from a personal perspective, the undersigned (whose duty station is in Rochester) was staying overnight in a hotel and frequenting restaurants in Buffalo during this trial, with no concerns.  At noon on March 13, 2020, shortly before the verdict was returned, the undersigned attended (also without any concerns) a judges' meeting in the Buffalo courthouse where everyone met in a conference room with no social distancing and no face coverings—a concept that seems foreign these

days.  The following week, the undersigned continued to conduct in-person court appearances, and it was not until March 19, 2020, that the undersigned cancelled future in-person court appearances and directed staff to commence teleworking.

In sum, there is absolutely no merit to the contention that the COVID-19 pandemic somehow unduly influenced the jury deliberations in this case.  The facts on the ground in Western New York simply do not support Defendant's reinvented history as to the reality of the situation between March 11 and 13, 2020.  Moreover, no juror raised any concern at any time with respect to the COVID-19 pandemic, and no party raised any concern. Defendant was just as aware as anyone else of the state of the COVID-19 pandemic at the time of the jury's deliberations, but never requested that the Court make any further inquiry.  There is no basis in the record to conclude that any juror was somehow improperly influenced, and Defendant's claims otherwise amount to nothing more than rampant speculation.  Accordingly, Defendant's Rule 33 motion is denied, as is his related request to conduct post-verdict interviews of the jurors.

## III.   **CONCLUSION**

For the foregoing reasons, Defendant's motions pursuant to Rules 29 and 33 are denied.  (Dkt. 310; Dkt. 340).

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated:  August 4, 2020
          Rochester, New York